UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS
WICHITA DIVISION

FILED
U.S. District Court
District of Kansas

JUL 29 2014

Clerk, U.S. District Court
By_____Deputy Clerk

IN THE MATTER OF THE APPLICATION OF THE  )
UNITED STATES OF AMERICA FOR AN ORDER     )  **FILED UNDER SEAL**
AUTHORIZING THE INSTALLATION AND USE      )
OF A PEN REGISTER AND TRAP AND TRACE      )  Case No. 14-CM-60053-EFM
DEVICE ON TELEPHONE NUMBER **316-882-3198** )
**(TARGET TELEPHONE #4)** AND THE         )
DISCLOSURE OF SUBSCRIBER AND CELL SITE    )
INFORMATION                                )

## APPLICATION

Comes now Mona Lee M. Furst, an Assistant United States Attorney for the District of Kansas, hereby applies to the Court for an Order authorizing:

The installation of a pen register and a trap and trace device on the following telephone number, (hereinafter "**Target Telephone #4**"), pursuant to Title 18, United States Code, Sections 3122 and 3123:

a. **316-882-3198,** IMSI: **310150801204200**; IMEI/ESN: **355375051683024**

(**Target Telephone #4**); a cellular telephone issued by AT&T subscribed to Mario BERTRAN, 1217 South Water, Wichita, Kansas, which is being utilized by Mario LNU

The disclosure of subscriber information, including the names and addresses (whether listed or unlisted), billing information, and periods of telephone activation for all numbers dialed or connections made to and from **Target Telephone #4,** and disclosure of the cell site information related to **Target Telephone #4,** all pursuant to Title 18, United States Code, Sections 2703(c)(1)(B), 2703(c)(2) and 2703(d).

1

B.  DEFINITIONS:

1)  A "pen register" is a "device or process which records or decodes dialing, routing, addressing or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication . . ." 18 U.S.C. § 3127(3).

2)  A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number" or other identifiers "reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information not include the contents of any communication." 18 U.S.C. § 3127(4).

3)  "Cell site information" is information about cell sites, cellular towers, or sectors that would tend to reveal where a telephone or device assigned to a Target Telephone Number is geographically located at the origination of a call (for outbound calling), the termination of a call (for incoming calls), and if reasonably available, during a call. Cell site information, as sought by this application, includes only the disclosure of: (a) information regarding cell site location that consists of the tower receiving transmissions from the **Target Telephone #4** (and any available information on the specific portion of that tower that is receiving such transmission); (b) tower information that is tied to a particular call made or received by the user of **Target Telephone #4**; and (c) such information that is transmitted by the relevant service providers and/or carriers to the United States, specifically to the Special Agents of the Drug Enforcement Administration (DEA), and obtained directly by the United States.

4)  "Post cut-through digits" are digits dialed from a Target telephone line after the initial call setup is completed. "Post cut-through digits" include those used to process and transmit a communication to its termination point, such as a calling card number and final destination

phone number entered after a customer has connected to his/her long-distance carrier's toll-free number (e.g. 1-800-CALL-ATT). "Post cut-through digits" also may include digits that form a text message or the contents of a communication, or that form a password, credit card number or other number used to access information or make purchases unrelated to the transmission of the communication itself.

5) "Service provider," as used in this Order, means any local, long distance, or wireless telephone carrier, and any other person or entity providing electronic or wire communication service in the United States whose assistance may facilitate execution of the requested court Order.

In support of this application, I state the following:

C. CERTIFICATION FOR A PEN REGISTER AND A TRAP AND TRACE DEVICE AND REQUEST FOR CONNECTING "POST CUT-THROUGH DIGITS"

1) I am an "attorney for the Government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure, and therefore, pursuant to Title 18, United States Code, Section 3122, may apply for an order authorizing the installation and use of pen registers and trap and trace devices.

2) Pursuant to Title 18, United States Code, Section 3122(b), I certify that the information likely to be obtained from the pen register and trap and trace device is relevant to an ongoing criminal investigation being conducted by the Drug Enforcement Administration (DEA) in connection with possible violations of federal criminal offenses, including Title 21, United States Code, Sections 841 and 846; and that it is believed that Mario LNU, and others known and unknown, have and will continue to use **Target Telephone #4** in furtherance of these criminal offenses.

3) Pursuant to Title 18, United States Code, Section 3121(c), DEA will "use technology reasonably available to it that restricts the recording or decoding of electronic or other impulses

to the dialing, routing, addressing, or signaling information utilized in the processing and transmitting of wire or electronic communications so as not to include the contents of any wire or electronic communications." I am aware, however, that reasonably available technology may not restrict the recording of "post cut-through digits" that form passwords, credit card numbers, text messages or the contents of a communication. The government requests authority to receive and use in its investigation only "post cut-through digits" related to dialing, routing, addressing, or signaling information, and the government does not seek, nor will it use in its investigation other "post cut-through digits" that may contain content unrelated to processing or transmitting a communication to its termination point. 4) Wherefore, based upon the above Certification, pursuant to Title 18, United States Code, Section 3123, I request that the Court issue an Order authorizing, for a period of sixty (60) days and without geographical limitation:

(a) the installation and use of a pen register to record the dialing, routing, addressing, or signaling information of any communication (including Direct-Connect features) originating from **Target Telephone #4** numbers, including "post-cut-through digits" used to process and transmit a communication to its termination point, along with the date and time of the communication, and the length of time the telephone receiver in question is off the hook for incoming or outgoing calls;

(b) the installation and use of a trap and trace device (including but not limited to, a caller identification system OR utilizing a caller identification feature known by trade name "Caller ID Deluxe") to capture the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of calls directed to **Target Telephone #4** number;

4

(c) pursuant to Title 18, United States Code, Section 3123(b)(1)(C), the installation and use of a pen register and trap and trace device on any changed telephone number subsequently assigned to an instrument bearing the same as **Target Telephone #4**, or any changed IMSI subsequently assigned to the same telephone numbers as **Target Telephone #4**, or any additional changed telephone numbers and/or IMEI or ESN or IMSI, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number of **Target Telephone #4** within the 60-day period authorized by this Order.

5) Pursuant to Title 18, United States Code, Section 3123(a)(1) and § 3123(b)(2), I further request that the Court direct service providers, upon service of the Court's Order, to furnish the information, facilities, and technical assistance necessary to accomplish unobtrusively the installation and use of the pen register and trap and trace device, with compensation to be paid by the investigative agency for reasonable expenses directly incurred in providing such facilities and assistance.

6) Applicant further requests that the Court's Order direct service providers, upon request, to notify of any and all changes (including additions, deletions, and transfers) in service regarding the above telephone numbers to include telephone numbers and subscriber information (published, non-published, and unlisted) associated with these changes.

7) Applicant further requests that the Court's Order direct service providers to furnish the results of the pen register and trap and trace installations, as well as cell site and subscriber information requested below, to Agents of the DEA as soon as practicable twenty-four (24) hours a day for the duration of the Order.

D.  **SPECIFIC AND ARTICULABLE FACTS ESTABLISHING REASONABLE GROUNDS TO BELIEVE THAT SUBSCRIBER AND CELL SITE INFORMATION IS RELEVANT AND MATERIAL TO AN ONGOING CRIMINAL INVESTIGATION**

1) In support of its request for an order under Title 18, United States Code, Sections 2703(c)(1)(B), 2703(c)(2) and 2703(d), directing the disclosure of subscriber and cell site information, the government hereby offers the attached Affidavit of DEA TFO Timothy A. Davis in support of its belief that there are specific and articulable facts showing that there is probable cause to believe that a crime has been and is being committed and that subscriber and cell site information for the Target telephone numbers, and the telephone numbers likely to be identified through the pen registers and trap and trace devices on the Target telephone numbers, are relevant and material to an ongoing criminal investigation. In addition, the government has discussed this matter with TFO Timothy A. Davis and would provide the following additional information:

   a. In TFO Davis's experience, telephone toll data captured by a pen register or trap and trace device, and the corresponding subscriber information, have in the past yielded information that is relevant and material to drug trafficking investigations. Such information often leads to: (1) the names of suspected suppliers, customers and other individuals who assist in the distribution of drugs; (2) the location of "stash" houses where drugs are stored; (3) the identity of transportation sources used by the drug traffickers; (4) the locations of money transfer businesses used by members of the operation to launder proceeds of drug trafficking activities or through which money is exchanged with coconspirators; (5) the geographic breadth of the suspected drug trafficking cell; and (6) the identity of potential organizers, leaders, managers, or supervisors of the suspected trafficking cell by examining the calling patterns

revealed by the toll data. TFO Davis has advised Applicant that based upon his training and experience, one way to identify coconspirators is to obtain subscriber information for calls made from **Target Telephone #4**, and then conduct an investigation concerning those names and addresses. Based upon subscriber information, TFO Davis would then direct other investigators to conduct surveillance at the addresses and determine if criminal activity was occurring there, which in turn could yield potential names of coconspirators and potential drug storage locations used by the organization.

b. TFO Davis has further advised the Applicant of the following: that the device characteristics (such as model and capabilities), network characteristics (such as a provider's System and Base Identity listings, which are FCC assigned numbers used to identify providers and to subdivide their service markets, and communications protocol, e.g. GSM, CDMA, TDMA or iDen and Cellular vs. PCS service band), cell site listings (physical locations and numbering of towers), cell site activations and facings (when, and as, accessed by the Target telephone numbers), control channels and sub channels (the non-content communications signals that coordinate calls and help determine when a cell site is switched or "handed-off"), signal strengths between the device and the cell site (used to estimate distance and determine when a cell site "hand-off" is necessary and possible), and other system information, when coupled with the subscriber records for all calls identified by the pen register and trap and trace device, may provide the general geographic location of the Target telephone number and, thus, may allow investigators to identify a suspect's location. Such information and records are routinely maintained by or are otherwise readily available

to communications service providers for a variety of purposes, including fraud/loss prevention, systems maintenance, diagnostics and development, and Federal Communications Commission and emergency "911" filings and compliance.

2) Based on the specific and articulable facts set forth above, pursuant to Title 18, United States Code, Sections 2703(c)(1)(B), 2703(c)(2) and 2703(d), I request that service providers be ordered to supply subscriber information (including the names and addresses, whether listed or unlisted, billing information, and periods of telephone activation) related to the dialing, routing, addressing, or signaling information captured by the pen register or trap and trace devices on **Target Telephone #4**;

3) Based on the specific and articulable facts set forth above, pursuant to Title 18, United States Code, Sections 2703(c)(1)(B), 2703(c)(2) and 2703(d), I also request that AT&T and other service providers be ordered to disclose cell site location information related to **Target Telephone #4**, at the origination of a call (for outbound calling), the termination of a call (for incoming calls), and if reasonably available, during a call. I also request that a service provider provide the cell site information related to the origination telephone of an inbound call to **Target Telephone #4**; or to the termination telephone of an outbound call from **Target Telephone #4**. I further request that AT&T and other service providers, be ordered to disclose (a) information regarding cell site location consisting of the tower receiving transmissions from the **Target Telephone #4** (and any available information on the specific portion of that tower that is receiving such transmissions), and (b) tower information that is tied to a particular call made or received by the user of the **Target Telephone #4**;

4. Based on the specific and articulable facts set forth above, pursuant to Title 18, United States Code, Sections 2703(c)(1)(B), 2703(c)(2) and 2703(d), I also request that AT&T and other

service providers provide call detail records, to include incoming and outgoing calls and corresponding cell site data, for a period of 14 days prior to the date of this order.

E.  REQUEST THAT APPLICATION AND ORDER BE FILED UNDER SEAL AND THAT THE ORDER PRECLUDE NOTICE

1) Based upon the information provided in this application, I believe that the disclosure of the requested Court Order may result in flight from potential prosecution, destruction of evidence, or may otherwise seriously jeopardize the investigation. Therefore, pursuant to Title 18, United States Code, Sections 2705(b) and 3123(d), I further request that the Court direct service providers, their agents and employees, not to disclose in any manner, to subscribers or to any other person, the existence of the Court's Order in any form, the existence of the pen register or trap and trace devices, or the existence of this investigation, unless otherwise ordered by this Court. I further request that this Application and the Order be sealed until otherwise ordered by this Court.

Dated this 29th day of July, 2014.

_____
MONA FURST
Assistant United States Attorney
District of Kansas

Subscribed and sworn to before me on this 29th day of July, 2014

_____
HONORABLE KAREN M. HUMPHREYS
United States Magistrate Judge
District of Kansas

9

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS
WICHITA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE ) <br> UNITED STATES OF AMERICA FOR AN ORDER ) <br> AUTHORIZING THE INSTALLATION AND USE ) <br> OF A PEN REGISTER AND TRAP AND TRACE ) <br> DEVICE ON TELEPHONE NUMBER **316-882-3198** ) <br> **(TARGET TELEPHONE #4)** AND THE DISCLOSURE ) <br> OF SUBSCRIBER AND CELL SITE INFORMATION ) | **FILED UNDER SEAL** <br><br> Case No. 14-CM-60053-EFM |

### AFFIDAVIT OF TIMOTHY A. DAVIS IN SUPPORT OF APPLICATION

Timothy A. Davis, having been duly sworn, states the following:

1. I have been employed by the Sedgwick County Sheriff's Office since 1999 and am currently a Detective assigned as a Task Force Officer with the Drug Enforcement Administration, Wichita Resident Office, and have been since June 2013. During my employment in law enforcement, I have initiated and participated in several investigations related to the distribution of controlled substances. During my assignment with the DEA, I have assisted on several cases that utilized the use of electronic surveillance and wiretap intercepts. Additionally, I have participated in additional investigations of drug-related conspiracies that utilized electronic surveillance. Prior to my assignment with the DEA, I was a narcotics detective with the Sedgwick County Sheriff's Office for approximately four (4) months. I have been involved in undercover purchases, controlled purchases, trash pulls, and the execution of search warrants. As a result, your Affiant has arrested numerous individuals for the violating State and Federal statutes with regards to possession, manufacture and sale of controlled substances and weapons. I have attended and successfully completed training courses relating to narcotics investigations.

1

2. I also have personal experience in the authorized interception of wire and electronic communications related to drug trafficking. As such, I have become familiar with the many methods and modes drug traffickers use to communicate about their illegal activities to include the use of cellular telephones with voice and text capabilities. For instance, cellular telephones are frequently used by drug traffickers to verbally and textually communicate various types of information with organization members, such as: (a) telephone numbers of co-conspirators; (b) the identities of co-conspirators involved in the drug trafficking enterprise; (c) locations of meetings with co-conspirators; (d) prices and quantities of controlled substances; and (e) alerts or warnings of the presence of law enforcement.

3. I am an investigator or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

4. I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other agents of the DEA and other law enforcement officers; from my discussions with witnesses involved in the investigation; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another agent, law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are

stated in substance and in part unless otherwise indicated. Since this affidavit is being submitted for the limited purpose of securing an order authorizing the acquisition of the Requested Information, I have not included details of every aspect of the investigation. Facts not set forth herein are not being relied on in reaching my conclusion that the requested order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

## BACKGROUND OF INVESTIGATION

5. On June 20, 2014, the Honorable Monti Belot signed an order authorizing the wire intercepts to and from 316-670-0730, used by Luis Joel MONTES D Sion. On June 29, 2014, investigators monitored a call with Unknown Male 142 (UM142) using 316-239-9629 (the "old number"). MONTES D Sion asked UM142 "how many Chicos (little guys) are you going to lend me?" UM142 replied, "Well I don't know, the guy told me about the number ten (10), that's what he said." MONTES D Sion replied, "Yes, that's fine but I don't know how you are doing, if you are tight or how you are doing?" UM 142 told MONTES D Sion "well, I keep another ten (10) for me." MONTES D Sion replied "yeah, look, so give me 8 and take right away the two (2) that I owed you there." Both agree talk later about where they can meet. (Investigators believe that "Chicos" is a code word used to describe either ounces or pounds and the above call refers to MONTES D Sion obtaining illegal narcotics from UM142.)

6. On July 7, 2014, members of the Wichita Resident Office and the Wichita Police Department conducted surveillance of MONTES. At approximately 11:45 a.m. in session 1499, Unknown Male 142 (UM 142) using 316-239-9629 contacted MONTES and MONTES informed UM 142 that he had "paper" (slang used by this organization to refer

3

to currency) to give to UM 142. MONTES tells UM 142 that he had an accident arriving to the "lights" (slang used by this organization for Las Vegas, Nevada) before getting it to the people. Your affiant is aware that $65,080 was recently seized in a car stop in Las Vegas from a vehicle which was registered to MONTES D Sion. UM 142 asked MONTES where he wanted to meet. MONTES stated that he had to shower and would contact UM 142 in about an hour or hour and a half.

7. On July 7, 2014 at approximately 12:49 p.m. MONTES called UM 142 and informed him that he could meet on 13th and West there at Dillons. The two agreed to meet in twenty minutes. Surveillance was conducted at the Dillons located at 3932 West 13th Street North, Wichita, Kansas. At approximately 1:19 p.m., TFO Shauna Sherwood observed MONTES driving his red Ford F-150 arrive and park just south of the front doors.

8. In session 1508 at approximately 1:15 p.m. MONTES told UM 142 that he was here at 13th and West. UM 142 said he would be there shortly. At approximately 1:25 p.m. in session 1512 MONTES called UM 142 and said that he was in a red vehicle parked in front of the doors. UM 142 stated that he will see him soon and he was in a black Impala. There were then two telephone calls where MONTES tries to explain where he is located, but the two cannot find each other. At approximately 1:34 p.m. surveillance units observed MONTES leave the Dillons. At approximately 1:43 p.m. in session 1532 UM 142 calls MONTES and the two agree to meet at the Chinese Buffet because UM 142 cannot find the Dillon's by a "QT" (Quik Trip convenience store).

9. At approximately 1:40 p.m., TFO Sherwood observed MONTES in the red Ford pull into the shopping center on the southwest corner of Central and West Street in Wichita,

4

Kansas. The red Ford parked in front of the Buffet City Restaurant located at 601 North West Street, Wichita, Kansas. TFO Sherwood observed a black Chevrolet Impala bearing Kansas tag 891GWF (registered on a 2006 Impala to Jose LEON-Leon of 1217 Water, Wichita, Kansas) parked in the Walmart parking lot in the same shopping center. TFO Sherwood observed the passenger of the Impala, a Hispanic male in a black shirt, exit the car. She watched the Hispanic male walk to MONTES' red Ford truck and get into the passenger seat. Approximately 2-3 minutes later, the driver of the Impala, a Hispanic male wearing a gray shirt, got out of the Impala, and walked to the passenger side of MONTES' truck, then walked back to the Impala. At approximately 1:53 p.m., the Hispanic male in the black shirt exited MONTES' truck and got back into the Impala. Both vehicles left the area at approximately 1:55 p.m. Surveillance units followed the two Hispanic males in the black Impala to 1217 Water, where the car parked off the back alley of the residence. Your affiant is aware that behavior such as that observed is consistent with the exchanging of controlled substances, and or US currency in payment for controlled substances.

10. On July 9, 2014, the Honorable J. Thomas Marten signed and order authorizing the wire intercepts to and from 620-966-6405 being utilized by German FERNANDEZ-Hernandez.

11. On July 15, 2014, in session 403, an unknown male was intercepted, using telephone number **316-882-3198 (Target Telephone #4)**. During that call, UM403 asked FERNANDEZ if he had heard about the men who had been "taken on vacation." (Your affiant is aware that on July 15, 2014, several individuals were arrested in a separate DEA case, after numerous pounds of methamphetamine were seized here and in Las

5

Vegas. The individuals arrested included MONTES D Sion. Your affiant believes the term "taken on vacation" refers to the individuals being taken into custody by law enforcement). UM403 told FERNANDEZ that he was calling from his new number and would not be using the old number any longer. This "old number" was later determined to be 316-239-9629, as discussed more thoroughly in paragraph 14 below.

12. On July 18, 2014, a detective with the Wichita Police Department acting in an undercover capacity (UC) ordered two pounds of methamphetamine to purchase from FERNANDEZ. The UC requested that FERNANDEZ make sure he had the product prior to the deal. Directly after the meeting, investigators saw from a court authorized pen register on 620-253-8854 a second phone used by FERNANDEZ, that FERNANDEZ called **Target Telephone #4.** FERNANDEZ then immediately called the UC back on 620-253-8854, which is not being intercepted, and told the detective, "Yes, no problem, I will be ready."

13. On July 21, 2014, the UC did not show up to take delivery of the ordered two (2) pounds of methamphetamine. Agents conducted physical surveillance of FERNANDEZ. Investigators followed FERNANDEZ and Cecilia GOMEZ (the driver of the vehicle) to 2118 South Topeka, Wichita, Kansas. At approximately 2:00 p.m., a black Chevrolet Impala bearing Kansas registration plate 891GWF also arrived at 2118 South Topeka and had contact with FERNANDEZ. This is the same vehicle and Kansas registration plate referred to in paragraphs 8 and 9 that was observed meeting with MONTES D Sion. From the agents' observations during this surveillance, it appeared that the black Impala's occupants were to be part of the 2 pound deal.

14. On July 23, 2014, TFO Ron Trollope contacted Liana Smith who is a civilian contractor working for DEA in the St. Louis Regional Office as a Spanish speaking Title III monitor for this investigation. TFO Trollope asked that Liana compare the voice of unknown male caller, UM403, using **Target Telephone #4** in this investigation to unknown male caller, UM142 using 316-239-9629, the "old number", in IL-11-0039, a case in which Liana had recently monitored. Liana listened to calls and compared the voices. Liana told TFO Trollope that in her opinion UM403 and UM142 are the same person. Telephone tolls for 620-966-6405 revealed that FERNANDEZ and UM403, using the "old number" of 316-239-9629, had indeed been in contact with each other between May 14, 2014 and July 6, 2014, on sixteen (16) separate occasions.

15. TFO Trollope learned by researching WPD records that 316-239-9629, the "old number", was listed by a Mario CASAREZ-Beltran on June 29, 2014 as his telephone number after he was involved in a traffic accident. CASAREZ-Beltran was driving a 2005 Cadillac bearing Kansas license plate 857GNX. In the report, CASAREZ-Beltran gave the address of 1518 East Kinkaid, Wichita, KS. However, the Kansas Department of Motor Vehicles shows 857GNX is registered on a 2005 Cadillac CTS to Mario BELTRAN-Casarez at 1217 South Water, Wichita, KS.

16. TFO Ron Trollope and your affiant learned via administrative subpoena that **316-882-3198 IMSI: 310150801204200; IMEI/ESN: 355375051683024(Target Telephone #4)** is subscribed through AT & T to Mario BERTRAN at 1217 South Water, Wichita, KS.

17. Based upon the voice comparison described in paragraph 14 of this report; the nearly identical names of Mario BERTRAN, Mario CASAREZ-Beltran and Mario BELTRAN-Casarez; and the fact that the black Impala and the Cadillac are both registered to 1217 S.

7

Water, your affiant believes that UM403 is the same man as UM142, and that he is actively involved in the distribution of methamphetamine using **Target Telephone #4.**

18. Based on training and experience, your affiant knows that it is imperative for a drug trafficker to utilize communication devices, such as **Target Telephone #4**, to facilitate their criminal activities. Your affiant knows that it is common for drug traffickers to carry more than one telephone, or to begin a conversation on one telephone, then resume the conversation on an alternate telephone to disrupt law enforcement detection. Your affiant is aware that it is common for drug traffickers to subscribe to pre-paid cellular telephone numbers because most providers do not require proof of identity for the subscriber. Your affiant believes that Mario LNU is currently utilizing the **Target Telephone #4** to engage in drug trafficking activities, and that the recording of incoming and outgoing data from this cellular telephone number, including the location of the cellular transmission/relay tower utilized by **Target Telephone #4**, is vital to the government's ongoing investigation.

FURTHER AFFIANT SAITH NOT.

_____
TIMOTHY A. DAVIS
Task Force Officer, DEA

SUBSCRIBED TO AND SWORN before me this the 29th day of July, 2014.

_____
HONORABLE KAREN M. HUMPHREYS
United States Magistrate Judge
District of Kansas

8